STATE OF WASHINGTON, Appellant,

v.

Stewart L. UDALL, Secretary of the Interior, et al., Appellees.

No. 22413.

United States Court of Appeals Ninth Circuit.

Oct. 14, 1969.

As Modified Oct. 14, 1969.

Rehearing Denied Dec. 24, 1969.

James M. Carter, Circuit Judge, dissented.

Roger P. Marquis (argued), Clyde O. Martz, Asst. Atty. Gen., Washington, D. C., Smithmoore P. Myers, U. S. Atty., Spokane, Wash., Ronald R. Hull, Asst. U. S. Atty., Yakima, Wash., for appellee.

Before HAMLIN, ELY, and CARTER, Circuit Judges.

ELY, Circuit Judge:

The State of Washington instituted this suit in an attempt to secure judicial review of an administrative determination by the Secretary of the Interior, acting through subordinate officials in the Bureau of Reclamation. The federal officials had determined that Washington was not entitled to the delivery of water from the Columbia Basin Project to more than 160 irrigable acres of certain state-owned lands within the South Columbia Basin Irrigation District. The District Court, relying on the Supreme Court's decision in Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), and holding that the United States was an indispensable party and had not consented to such a suit against it, dismissed the State's complaint upon the basis of the doctrine of sovereign immunity. The State appeals, contending that the United States has waived its immunity through the Administrative Procedure Act, 5 U.S.C. §§ 701–706, or the mandamus statute, 28 U.S.C. § 1361. For reasons that follow, we have concluded that the doctrine of sovereign immunity did not operate to require dismissal of the State's complaint.

The State also urges that jurisdiction was vested in the District Court under the Tucker Act, 28 U.S.C. § 1346(a) (2), to the extent that it was empowered to award damages that were not in excess of $10,000. As to this, we have concluded that the State attempted, impermissibly, to split its cause of action in its effort to invoke Tucker Act jurisdiction.

In the South Columbia Basin Irrigation District the State of Washington owns, in trust for the benefit of the common public educational institutions of the state, fourteen tracts of school lands containing 1,594 irrigable acres. In July of

Harold T. Hartinger (argued), Asst. Atty. Gen., John J. O'Connell, Atty. Gen., J. R. Pritchard, Asst. Atty. Gen., Olympia, Wash., for appellant.

1966, the State paid all current assessments on 252.3 of these acres, designated as Farm Units 34 and 35, and demanded delivery of water. The Government's Project Manager for the Columbia Basin Project denied delivery of the water to more than 160 irrigable acres because of the "excess land" or "160-acre limitation" imposed by Congress in 43 U.S.C. § 423e upon "all irrigable land held in private ownership by any one owner * * *."[1] The State argues that its school lands are not, in the terms of 43 U.S.C. § 423e, "held in private ownership" and that, therefore, the 160-acre limitation for delivery of water from the federal project is inapplicable.[2] The State thus contends that the Project Manager's withholding of water from the portion in excess of 160 acres within Farm Units 34 and 35 "was without lawful justification, constituted arbitrary and capricious action, and violated a plain legal duty."

The source of the disagreement between state and federal authorities lies in their conflicting interpretations of the effect of Public Law 87–728 § 3, 76 Stat. 677, enacted in 1962. Under the earlier provisions of the Columbia Basin Project Act,[3] the State was precluded from receiving federal project water for its school lands unless it executed recordable contracts providing (1) for the conforming, by purchase, sale, or exchange, of its land into farm units platted by the Secretary of the Interior in sizes, not more than 160 acres, for the support of an average family and (2) for the sale of excess lands under procedures specified in the Act. The State faced a dilemma because it was precluded by the Washington Enabling Act[4] and the Washington Constitution[5] from executing recordable contracts for land sales in the manner specified by the Columbia Basin Act. Congress dealt with the dilemma by legislation in 1950 which authorized the State and the Secretary of the Interior to enter into an agreement for disposition of the State's school and other public lands in a manner comporting with the requirements of the Washington Constitution and provided that purchasers of State lands would not be disqualified from executing the required recordable contracts by reason of the purchase price paid to the State. Accordingly, the State and the Secretary entered into a formal agreement in 1951 providing for a plan of disposal of excess State lands and for the execution of recordable contracts by purchasers from the State. After the agreement was executed, the necessary precondition for delivery of water to school lands was fulfilled. Subsequently, however, on Oct. 1, 1962, Congress repealed the 1950 legislation which authorized the agreement by the enactment of Public Law 87–728, § 3, 76 Stat. 678, and, in the same section, directed that the Columbia Basin Project should thenceforth be governed by the general Federal Reclama-

1. See Taylor, The Excess Land Law: Execution of a Public Policy, 64 Yale L.J. 477 (1955) (legislative history and reasons for the 160-acre limitation). See also Ivanhoe Irrig. Dist. v. McCracken, 357 U.S. 275, 292, 78 S.Ct. 1174, 2 L.Ed. 2d 1313 (1958) (policy of maximizing the distribution of federal reclamation benefits).

2. In support of its argument, the State of Washington cites, inter alia, H.R.Rep. 176, 86th Cong., 1st Sess. 1–2 (1959), and Acreage Limitation Policy—A Study Prepared by the Department of Interior 21, 88th Cong., 2d Sess. (Comm.Print 1964).

3. Act of Mar. 10, 1943, ch. 14, 57 Stat. 14.

4. Act of Feb. 22, 1889, ch. 180, 25 Stat. 676, as amended, Act of May 7, 1932, ch. 172, 47 Stat. 150. Congress, in a statute also repealed by the 1962 legislation, waived application of the conflicting requirements of the Enabling Act as to the disposal of excess state lands in connection with the Columbia Basin Project. Act of May 27, 1937, ch. 269, § 4, 50 Stat. 210, as amended, Act of Mar. 10, 1943, ch. 14, § 9, 57 Stat. 20.

5. Wash.Const., art. 16, §§ 1–2.

tion Laws,[6] including 43 U.S.C. § 423e and its 160-acre limitation for "land held in private ownership."

Following the enactment of the 1962 legislation, which withdrew legislative authorization for the 1951 contractual agreement, federal officials refused to deliver irrigation water to the State's excess school lands and refused to acknowledge any continuing obligation under the 1951 contract. The State argues that the only effect of the 1962 legislation was to conform the regulatory program for the Columbia Basin to that of other reclamation areas under the general Federal Reclamation Laws, under which, the State contends, its school lands are not subject to the excess land restrictions applied to private landowners. The State submits that, since the disposal of excess school lands is no longer necessary for the delivery of project water, the 1950 legislation which authorized the 1951 contract was no longer necessary and that this was the reason for its repeal.

The State sought a declaration by the District Court that the 160-acre limitation does not apply to Farm Units 34 and 35 and that all school lands are eligible for water from the Columbia Basin Project, an injunction restraining federal officials from requiring the execution of recordable contracts as a precondition to delivery of water to excess lands, and mandatory relief ordering federal officials to deliver federal project water to all irrigable acres in Farm Units 34 and 35. The State also sought monetary dam-

ages for the failure of federal officials to deliver water to the excess lands in these farm units. Since each unit by itself contained less than 160 acres, the combined excess was designated to lie in Farm Unit 35. The State, in an attempt to preserve jurisdiction over this issue in the District Court, waived any claim for damages to Farm Unit 35 in excess of $10,000.

The appellees argue, in support of the judgment of dismissal below, that the suit was essentially one for specific performance of contractual obligations of the United States, an indispensable party, and that the United States has not consented to such a suit. The State, however, responds that it did not seek specific performance of the 1951 contract but, rather, relief based on the failure of federal officials to conform their actions to statutory requirements. To resolve the problem, we review the numerous Supreme Court opinions regarding the doctrine of sovereign immunity.

In Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1928 (1949), the respondent corporation had sought to compel the War Assets Administrator to deliver certain surplus coal in accordance with a contract that the Administrator had made with the respondent. The Supreme Court directed the dismissal of the suit because of the sovereign immunity of the United States, an indispensable party that had not consented to the suit.[7] The Court reasoned that the suit against the War

---

6. Federal Reclamation Act of June 17, 1902, 32 Stat. 388, as amended and supplemented. Public Law 87–728 § 3 also preserved and amended section 4 of the Columbia Basin Project Act. This section concerns the administration and disposal of public lands of the United States within the Columbia Basin Project area.

7. The result in *Larson* was generally in accord with prior Supreme Court cases which had denied relief in suits for either specific performance of a government contract or for the conveyance of government property solely on the basis of an equitable claim to that property. *See* Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv.L.

Rev. 1, 29–33 (1963); Byse, Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus, 75 Harv.L. Rev. 1479, 1485 n. 19 (1962) ("[R]elief [to direct officials to give over government property] probably would be granted if the official's duty * * * were found to be 'ministerial.'"); Comment, 8 Stan. L.Rev. 683, 684–86 (1956). *But see* Davis, Sovereign Immunity In Suits Against Officers For Relief Other Than Damages, 40 Corn.L.Q. 3, 18–30 (1954). The reasoning and language of the Court's opinion, however, have been strongly criticized by respected commentators. *See* Jaffe, *supra*, at 29–37; Byse, *supra*, at 1485–93; Davis, *supra*, at 18–30, 37.

Assets Administrator was in reality a suit against the United States since it sought a court order concerning the disposition of property of the United States directed to all officials acting under the authority of the Administrator. *Id.* at 688–689, 69 S.Ct. 1457. The Court announced that it would indulge in the legal fiction that a suit against a government officer in his official capacity was not a suit against the sovereign, and hence not subject to defeat by the doctrine of sovereign immunity, only if (1) the officer's powers are limited by statute and his actions were ultra vires, or (2) the officer was acting unconstitutionally or pursuant to an unconstitutional grant of power from the sovereign. *Id.* at 689–691, 69 S.Ct. 1457. The Court decided that the War Assets Administrator was not alleged to have acted unconstitutionally or in excess of his delegated statutory powers, but rather to have made an erroneous and tortious decision within the general area of his authority, the executing and performing of government contracts. If the Administrator's withholding of the coal was erroneous, it was a wrong committed within the valid authority delegated by the sovereign, and upon that theory the Court dismissed the suit. *Id.* at 691–704, 69 S.Ct. 1457.

The Supreme Court reaffirmed *Larson* in Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962), stating that it was not necessary to resolve the large number of apparently conflicting Supreme Court decisions prior to *Larson.* The Court in *Malone* explained, at 646, 82 S.Ct. at 983.

> "For in *Larson* the Court, aware that it was called upon to 'resolve the conflict in doctrine' (337 U.S., at 701 [69 S.Ct. at 1467]) thoroughly reviewed the many prior decisions, and made an informed and carefully considered choice between the seemingly conflicting precedents."

*Malone* involved an ejectment action against a United States Forest Service Officer performing his official duties on land claimed by the United States and also claimed by the petitioner on the basis

of his status as a remainderman under an 1857 will. The Court invoked the doctrine of sovereign immunity in the following terms:

> "No such claim [of unconstitutionality] has been advanced in the present case. Nor has it been asserted that the petitioner was exceeding his delegated powers as an officer of the United States in occupying the land in question, or that he was in possession of the land in anything other than his official capacity. This suit, therefore, is not in the class of cases in which, under *Larson,* specific relief. can be obtained against a government officer. Accordingly, it was \* \* \* in sub-stance and effect one against the United States without its consent."

*Id.* at 648, 82 S.Ct. at 984. The Court noted that just compensation against the United States could be obtained in the Court of Claims and that therefore the case did not fall within the unconstitutionality exception to the doctrine of sovereign immunity. *Id.* at 647, 82 S.Ct. 980. Professor Jaffe has written favorably of the *Malone* decision upon the theory that the United States may regulate, in a reasonable fashion, suits against its officers and that it may abolish suits against its officers by taking liability upon itself in a specified manner, such as by prescribing an action for damages in the Court of Claims. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv.L.Rev. 1, 38–39 (1963).

The Supreme Court reiterated, in 8–0 decisions, the *Larson-Malone* formulation of the doctrine of sovereign immunity in Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), and in a companion case, City of Fresno v. California, 372 U.S. 627, 83 S.Ct. 996, 10 L. Ed.2d 28 (1963). In these cases, certain claimants of water rights had sued officials of the Bureau of Reclamation of the Department of the Interior to enjoin them from diverting river waters for a public project and to obtain an adjudication of the water rights in controversy.

We read, from *Dugan* at 620–622, 83 S. Ct. at 1006–1007:

"The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' Land v. Dollar, 330 U.S. 731, 738 [67 S.Ct. 1009, 1012, 91 L.Ed. 1209] (1947), or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it tó act.' Larson v. Domestic & Foreign Corp., supra, [337 U.S.] at 704 [69 S.Ct. at 1468, 93 L.Ed. 1628]; Ex parte New York, 256 U.S. 490, 502 [41 S.Ct. 588, 591, 65 L. Ed. 1057] (1921). The decree here enjoins the federal officials from 'impounding, or diverting, or storing for diversion, or otherwise impeding or obstructing the full natural flow of the San Joaquin River. * * *' Transcript of Record, Vol. III, p. 1021. As the Court of Appeals found, the Project 'could not operate without impairing, to some degree, the full natural flow of the river.' Experience of over a decade along the stretch of the San Joaquin involved here indicates clearly that the impairment was most substantial—almost three-fourths of the natural flow of the river. To require the full natural flow of the river to go through the dam would force the abandonment of this portion of a project which has not only been fully authorized by the Congress but paid for through its continuing appropriations. Moreover, it would prevent the fulfillment of the contracts made by the United States with the Water and Utility Districts, which are petitioning in No. 115. The Government would, indeed, be 'stopped in its tracks * *.' Larson v. Domestic & Foreign Corp, supra. [337 U.S.] at 704 [69 S.Ct. at 1468, 93 L.Ed. 1628].

" * * * The judgment, therefore, would not only 'interfere with the public administration' but also 'expend itself on the public treasury * * *.' Land v. Dollar, supra [330 U.S.] at 738 [67 S.Ct. at 1012, 91 L.Ed. 1209]. Moreover, the decree would require the United States—contrary to the mandate of the Congress—to dispose of valuable irrigation water and deprive it of the full use and control of its reclamation facilities. It is therefore readily apparent that the relief granted operates against the United States.

"Nor do we believe that the action of the Reclamation Bureau officials falls within either of the recognized exceptions to the above general rule as reaffirmed only last Term. Malone v. Bowdoin, 369 U.S. 643 [82 S.Ct. 980, 8 L.Ed.2d 168]. See Larson v. Domestic & Foreign Corp., supra; Santa Fe Pac. R. Co. v. Fall, 259 U.S. 197, 199, 42 S.Ct. 466, 467, 66 L.Ed. 896 (1922); Scranton v. Wheeler, 179 U.S. 141, 152–153, 21 S.Ct. 48, 52–53, 45 L.Ed. 126 (1900). Those exceptions are (1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void. Malone v. Bowdoin, supra, [369 U.S.] at 647 [82 S.Ct. at 983, 8 L.Ed.2d 168]. In either of such cases the officer's action 'can be made the basis of a suit for specific relief against the officer as an individual * * *.' *Ibid.*"

The Court, in applying the rule of sovereign immunity, concluded that the federal officials had been authorized by Congress to seize the waters of the river and that such authorization was constitutionally permissible because,

"The question was specifically settled in Ivanhoe Irrigation District v. McCracken, supra [357 U.S. 275, [78 S.Ct. 1174, 2 L.Ed.2d 1313] (1958)], where we said that such rights could be acquired by the payment of compensation 'either through condemnation or, if already taken, through action of the own-

ers in the courts.' 357 U.S., at 291 [78 S.Ct. at 1183, 2 L.Ed.2d 1313]." *Id.* at 619, 83 S.Ct. at 1006.[8]

■ Our examination of the Supreme Court decisions in *Larson, Malone,* and *Dugan* leads us to conclude that Washington's complaint in this case falls within the ultra vires exception to the bar of sovereign immunity. Although the thrust of the State's argument has not centered upon the possibility that federal officials acted beyond their delegated authority, the State has alleged that the federal officials violated a plain legal duty and were arbitrary and capricious in their actions because of their allegedly erroneous interpretation of 43 U.S.C. § 423e that school lands were "land held in private ownership."

■ Of course, the mere allegation that a federal officer's action is erroneous, due to a mistake of fact or law, does not necessarily constitute a claim that he was acting beyond his delegated authority. *See* Dugan, *supra,* 372 U.S. at 622, 83 S.Ct. 999; Larson, *supra,* 337 U.S. at 695, 69 S.Ct. 1457, *citing* Adams v. Nagle, 303 U.S. 532, 542, 58 S.Ct. 687, 82 L.Ed. 999 (1938). Nevertheless, if the State's interpretation of 43 U.S.C. § 423e is correct, the Secretary's imposition of a 160-acre limitation does not appear to be within his delegated powers. The resolution of this issue depends on whether Congress granted to the Secretary of the Interior, in his executing of contracts for the delivery of irrigation water, the discretionary authority to make incorrect as well as correct decisions concerning the necessity for the inclusion of 160-acre limitations in the contracts.[9] We find words of discretion in § 423e, but not as to the 160-acre limitation:

"*No water shall be delivered * * * until a contract* or contracts in form approved by the Secretary of the Interior *shall have been made with an irrigation district * * ** providing for payment by the district * * * of the cost of constructing, operating, and maintaining the works during the time they are in control of the United States, such cost to be repaid within such terms of years as the Secretary may find to be necessary, in any event not more than forty years * * *. Prior to or in connection with the settlement and development of each of these projects, the Secretary of the Interior is authorized in his discretion to enter into agreement with the proper authorities of the State or States * * * whereby such State or States shall co-operate with the United States in promoting the settlement of the projects or divisions after completion and in the securing and selecting of settlers. *Such contract or contracts with irrigation districts* hereinbefore referred to *shall provide that all irrigable land held in private ownership by any one owner in excess of one hun-*

---

**8.** In an appropriate case, of course, a former owner of property in the hands of the United States could obtain specific relief if he could demonstrate that the property was not taken for a "public use." *Cf.* Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); Puerto Rico v. Eastern Sugar Assoc., 156 F.2d 316 (1st Cir.), cert. denied, 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664 (1946).

**9.** *See* Byse, *supra* note 7, at 1490–91; Jaffe, The Right to Judicial Review I, 71 Harv.L.Rev. 401, 437 (1958); cf. Adams v. Nagle, 303 U.S. 532, 542, 58 S.Ct. 687, 82 L.Ed. 999 (1938). Professor Byse has observed,

"The vice of *Larson* and its progeny is that they permit—perhaps even encourage—courts to shirk the hard task of determining the limits of official power. It is perfectly possible for a court to hold that an official has authority to make erroneous as well as correct determinations. Such a holding, of course, should rest on a reasoned determination that Congress intended to confer so broad a discretion. But under *Larson * * * et al.,* the courts seem to interpret the statutes cursorily to authorize the defendant official to act in the 'general' area in question; so long as the official remains within the 'general' area, his erroneous acts are unreviewable whether or not the statute properly construed was intended to confer such an unreviewable discretion. This, I submit, is an abdication of judicial responsibility." 75 Harv.L.Rev. at 1490–91 (citations omitted).

*dred and sixty irrigable acres shall be appraised* in a manner to be prescribed by the Secretary of the Interior and the sales prices thereof fixed by the Secretary on the basis of its actual bona fide value at the date of appraisal without reference to the proposed construction of the irrigation works; *and that no such excess lands so held shall receive water* from any project or division *if the owners thereof shall refuse to execute valid recordable contracts for the sale of such lands* under terms and conditions satisfactory to the Secretary of the Interior * * *." (Emphasis added.)

Since the essence of Washington's case on the merits requires determination of whether the Secretary of the Interior, acting through his subordinate officials, exceeded his statutory authority by insisting on the 160-acre limitation authorized only in contracts for the delivery of water to "land held in *private* ownership," the case falls squarely within one of the Supreme Court's expressly stated exceptions to the application of the immunity doctrine.

Although an officer may have acted ultra vires or unconstitutionally, it is nevertheless possible that the doctrine of sovereign immunity will bar certain types of *relief* against the Government. The Court in *Larson, supra,* 337 U.S. at 691 n. 11, 69 S.Ct. at 1462, added the following qualification regarding a case that falls within one of the two express exceptions contained in the sovereign immunity rule:

"Of course, a suit *may* fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property. North Carolina v. Temple, (1890) 134 U.S. 22 [10 S.Ct. 509, 33 L.Ed. 849]." [emphasis added]

We do not interpret the *Larson* Court's footnote 11 to mean that a suit *must* fail if the relief sought includes "affirmative action by the sovereign or the disposition of unquestionably sovereign property." Professor Jaffe has written that the *Larson* opinion indicated no intent to overrule a long line of cases wherein such relief was granted against the Government. The relief approved in these cases includes mandamus to require the affirmative grants of patents to public lands of the United States and injunctive relief compelling the Secretary of the Interior to deliver certain irrigation water to users in the State of Washington according to their rights under the Federal Reclamation Act—the same Act as is involved in the present controversy.[10] *See* Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937), cited with ap-

---

10. On the interpretation of *Larson's* footnote 11 qualification, quoted above in the text, Professor Jaffe writes as follows:

"If [Mr. Chief Justice] Vinson's *may* is read as *may* and not as *must*, it is unobjectionable. North Carolina v. Temple was a suit to require the state to levy taxes to fund bonds and no type of suit, as we know, is more centrally within the prohibition of the eleventh amendment. But if a decree which requires 'affirmative action by the sovereign,' *e. g.,* grant of a license, of a civil service post or any other of the actions traditionally enforced by mandamus, if

such a decree could no longer be made, then *Larson* would have worked a sharp and startling change. And, similarly, if it excludes an order to dispose "of unquestionably sovereign property,' it would overrule a long line of Supreme Court decisions. There is nothing whatever in the opinion to indicate an intention to override such well-established doctrines, let alone any reason to do so. The only possible explanation would be a desire for some abstract doctrinal purity."

Jaffe, *supra* note 7, at 34 (citations omitted).

proval in Arizona v. California, 373 U.S. 546, 584–585, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930), followed by Udall v. Oil Shale Corp., 406 F.2d 759 (10th Cir. 1969); Work v. United States ex rel. McAlester-Edwards Co., 262 U.S. 200, 43 S.Ct. 580, 67 L.Ed. 949 (1923); Payne v. Central Pac. Ry., 255 U.S. 228, 41 S.Ct. 314, 65 L.Ed. 598 (1921); Lane v. Hoglund, 244 U.S. 174, 37 S.Ct. 558, 61 L.Ed. 1066 (1917); Ballinger v. United States ex rel. Frost, 216 U.S. 240, 30 S.Ct. 338, 54 L.Ed. 464 (1910).

Judge Browning of our court, in a thorough study of the *Larson-Malone-Dugan* trilogy, has written that the language of the *Dugan* opinion refuted the possibility that *Larson* might stand for the broad proposition that sovereign immunity precluded all suits, although based on unconstitutional or ultra vires acts, for affirmative relief or for the disposition of property of the United States. Turner v. Kings River Conservation Dist., 360 F.2d 184, 189–190 (9th Cir. 1966). We read, at 190,

> "We conclude from this that although the relief sought may be such that under the 'general rule' a suit would appear to be one against the sovereign, the action is nonetheless maintainable against government officers under the two 'exceptions' to the 'general rule' if the acts of the officers were prohibited by statute or the Constitution."

We reaffirm our position in *Turner* that the *Larson* opinion was not intended to preclude, in the name of sovereign immunity, *all* suits for affirmative relief or for the recovery of property of the United States.

We believe that the Court's footnote 11 in *Larson* means that the purposes for the doctrine of sovereign immunity may be controlling in some suits against officers so that the suits must be dismissed as suits against the Government, even though the officers were not acting pursuant to valid statutory authority, because the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm. In such cases a party must be denied all judicial relief other than that available in a possible action for damages. *See, e.g.,* Morrison v. Work, 266 U.S. 481, 485–486, 45 S.Ct. 149, 69 L.Ed. 394 (1924) (Opinion of the Court by Mr. Justice Brandeis).

Although the Supreme Court in *Dugan* held that the federal officials concerned therein were not acting unconstitutionally or in excess of their delegated authority, the Court nevertheless undertook an extended analysis of the public benefits resulting from the officers' diversion of the river waters for a federal project and the potential defeat of a substantial portion of the project if the officials were enjoined from diverting water for the project because of the alleged rights of private users of the water. 372 U.S. at 620–621, 626, 83 S.Ct. 999. The relative equities and burdens in the present case, as alleged by the State of Washington, stand in sharp contrast to those in *Dugan.* The Government does not seek to limit the supply of irrigation water to the State in order to avoid disruption of the Columbia Basin Project or to assure a remaining supply for some other federal or public use. Federal officials are willing to deliver water to the irrigable lands in question;[11] the

---

11. In this connection it is pertinent to note that the Project Manager of the Columbia Basin Project submitted to the State, on August 5, 1966, a proposed "Recordable Contract" for the sale of excess school lands as a precondition to the delivery of irrigation water to those lands. The following provision was included in the proposed contract:

> "14. In the event that the Congress of the United States repeals the so-called excess land provisions of the Reclamation Law, this excess land recordable contract shall no longer be of any force or effect * * *."

only issue is whether the State must terminate its ownership of its school lands before delivery. If the State is correct in its interpretation of 43 U.S.C. § 423e, that its lands are not "held in private ownership," Congress has evidenced no intention that its policy is to limit water deliveries to the common school lands in question.[12]

Consequently, there appears no reason pertaining to sovereign immunity why the District Court should not consider the State's complaint on its merits in order to determine whether the Secretary of the Interior or his subordinates have exceeded their statutory authority by imposing the excess-land policy. The resolution of this issue depends upon a statutory interpretation of the reclamation laws, particularly 43 U.S.C. § 423e. Certainly a court of the United States is an appropriate body for an interpretation of the statute. Federal courts, including the Supreme Court and ours, have often exercised powers of review over decisions of the Secretary of the Interior. *See, e.g.,* United States v. Coleman,[13] 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968); Arizona v. California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); Nebraska v. Wyoming, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945); Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937); Wilbur v. United States ex rel. Krushnic,

280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930); Udall v. Oil Shale Corp., 406 F.2d 759 (10th Cir. 1969); Converse v. Udall, 399 F.2d 616 (9th Cir. 1968), cert. denied, 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569 (1969); Brennan v. Udall, 379 F.2d 803 (10th Cir.), cert. denied, 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967); Turner v. Kings River Conservation Dist., 360 F.2d 184 (9th Cir. 1966); Adams v. Witmer, 271 F.2d 29 (9th Cir. 1958).

Since the doctrine of sovereign immunity did not deprive the District Court of jurisdiction to interpret legislation for the determination of whether the Secretary exceeded his delegated authority, the District Court had jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701–706.[14] The Act contains two exceptions to the availability of review, neither of which is applicable to this case. Section 701(a) excludes administrative action from review "to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." We have found no statute purporting to prohibit judicial review of the actions of the Secretary of the Interior in a case such as this. Furthermore, since the immunity doctrine does not preclude this suit, agency action is not committed to agency discretion "by law."

12. Congress has limited the permissible delivery of water to Washington State University for agricultural research purposes to 640 acres of irrigable lands. Act of Oct. 1, 1962, Pub.L.No. 87–728, § 7, 76 Stat. 679.

13. In *Coleman,* although the immunity doctrine was not involved because the United States was plaintiff, the Supreme Court went directly to the merits of the case to determine whether the Secretary correctly applied a legal standard. Washington seeks no more in this case.

14. The District Judge, in his oral decision, stated, "Further, I do feel that there are administrative remedies that have not been pursued, but I am assuming that if they had been we would arrive at the same point where we are now [dismissal

of the case because of sovereign immunity]." Since we have determined on this appeal that the case should be determined on its merits, the District Court may, on remand, if it determines such action is proper, require that the State exhaust its administrative remedies. *See* Administrative Procedure Act, 5 U.S.C. § 704; cf. McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194, 203–204 (1969); Craycroft v. Ferrall, 408 F.2d 587, 594–595 (9th Cir. 1969). In such event, the District Court may, in its discretion, retain jurisdiction pending the exhaustion of remedies in order to permit its utilization, in any future proceeding, of pleadings and briefs already on file. Compare Krieger v. Terry, 413 F.2d 73 (9th Cir. 1969).

**1320**

We therefore conclude that the District Court had the power of review prescribed by Congress in §§ 702–706.

▇ While we hold that the Secretary's challenged action in this case is subject to judicial review under the Administrative Procedure Act, we strongly emphasize our opinion that such review is *not* available on the theory that the Act constitutes a consent of the United States to all suits of whatever nature and, as such, a blanket waiver of sovereign immunity. In any case wherein the immunity doctrine is so transcending as to require dismissal of the suit, the Act does not provide for Administrative Review. The Supreme Court has not found jurisdiction under the Administrative Procedure Act in cases wherein the actions of the Secretary of the Interior have been held to be shielded from judicial review by sovereign immunity. *See* City of Fresno v. California, *supra,* 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28; Dugan v. Rank, *supra,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15. *See also* Blackmar v. Guerre, 342 U.S. 512, 515–516, 72 S.Ct. 410, 412, 96 L.Ed. 534 (1952) (8–1 decision concerning review of a Civil Service Commission decision) "Still less is the [Administrative Procedure] Act to be deemed an implied waiver of all governmental immunity from suit."; Motah v. United States, 402 F.2d 1 (10th Cir. 1968); Chournos v. United States, 335 F.2d 918 (10th Cir. 1964); L. Jaffe, Judicial Control of Administrative Action 372 (1965) (Administrative Procedure Act has had a negligible effect on the basic right to judicial review but does codify the presumption of reviewability).

▇ The Administrative Procedure Act may, however, provide a basis for review of governmental decisions if, and only if, the immunity doctrine is not so controlling so as to bar the suit. Nu-

merous cases have involved review under the Act of decisions of the Secretary of the Interior in situations wherein the doctrine of sovereign immunity was not considered to require dismissal. *See* Converse v. Udall, *supra,* 399 F.2d 616; Brennan v. Udall, *supra,* 379 F.2d 803; Coleman v. United States, 363 F.2d 190 (9th Cir. 1966), rev'd on other grounds, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968); Foster v. Seaton, 106 U.S. App.D.C. 253, 271 F.2d 836 (1959), cited with approval in Best v. Humboldt Mining Co., 371 U.S. 334, 338 n. 7, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); Adams v. Witmer, *supra,* 271 F.2d 29; cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (agency action reviewable under Administrative Procedure Act absent "clear and convincing evidence" of contrary legislative intent). *See also* Mulry v. Driver, 366 F.2d 544 (9th Cir. 1966) (review of orders and regulations of the Administrator of the Veterans Administration).

Under the foregoing principles, since sovereign immunity did not require dismissal of the complaint in this case, District Court jurisdiction also existed under the federal question and declaratory judgment statutes, 28 U.S.C. §§ 1331, 2201, and under the mandamus statute, 28 U.S.C. § 1361.[15]

▇ The District Court correctly decided that the State impermissibly split its claim for damages under the Tucker Act, 28 U.S.C. § 1346(a) (2), in an attempt to limit the amount in controversy to less than $10,000, the jurisdictional limit specified by the Act. The State cannot carve out for suit in the District Court 251.8 irrigable acres, comprising Farm Units 34 and 35, from its 1594 acres within the irrigation district. The State contends that a controversy involving separate parcels of real property

15. The mandamus statute, like the Administrative Procedure Act, is not a consent on the part of the United States to be sued and, therefore, a waiver of sovereign

immunity. *See* White v. Administrator of General Services Administration, 343 F.2d 444, 447 (9th Cir. 1965); Byse, *supra* note 7, at 1507–08.

creates inherently separate causes of action and that a present controversy exists only as to Farm Units 34 and 35 because the State has not paid the assessments necessary for delivery of water to its other lands. The State's complaint in the District Court, however, alleged that assessments against Farm Units 34 and 35 were paid "for the purpose of resolving all questions about its right to receive water from the Columbia Basin Project for [all 1,594 acres]." The same factual and legal issues pertain to the entire 1,594 acres in determining whether or not they are subject to the 160-acre limitation upon payment of assessments. See Baltimore SS. Co. v. Phillips, 274 U.S. 316, 321, 47 S.Ct. 600, 71 L.Ed. 1069 (1927); Sutcliffe Storage & Warehouse Co. v. United States, 162 F.2d 849 (1st Cir. 1947). If the District Court should, upon remand, determine that the amount in controversy concerning all of the school lands in question is less than $10,000, then, of course, jurisdiction is conferred by the Tucker Act.

Reversed and remanded.

JAMES M. CARTER, Circuit Judge (dissenting):

I respectfully dissent. The factual situation which forms the basis of the case before us is a frustrating one, but one in which neither the officials of the State of Washington nor of the United States government have been arbitrary or capricious in their actions.

The case concerns the desire of the State of Washington to secure water for its school lands. Under Washington law the disposal of such lands is restricted by Sec. 11 of the Washington Enabling Act and by Art. 16, §§ 1 and 2 of the Washington Constitution, which provide in substance, that the school lands shall be disposed of only at public sale or public auction. The statutes of the United States, in particular 43 U.S.C. § 423e provide in substance, that as to lands held in private ownership water will not be supplied for an area in excess of 160 acres unless there is a valid recordable contract for the sale of the lands in excess of 160 acres, at terms and conditions satisfactory to the Secretary, and at prices not to exceed those fixed by the Secretary.

Public Law 851, 81st Cong., 2d Sess., 64 Stat. 1074 (1950) solved the problem while the law was in existence. However, the enactment of Public Law 87–728, Sec. 3; 16 U.S.C. § 835–*l* [Supp. 1966], 76 Stat. 677–679 (1962) on October 1, 1962 changed the situation and repealed the statutory basis for an agreement entered into between the State of Washington and the Secretary under the 1950 statute. 43 U.S.C. § 423e again became effective.

Without doubt Washington is entitled to relief from the intolerable situation that prevents its sale of school lands since water cannot be obtained under the present Federal statutes. Hard cases make bad law. The situation is one for Congress to remedy, and not for this court to, in substance, legislate.

The district court applied the doctrine of sovereign immunity and dismissed on the ground that the action was, in substance, an action against the United States and that the United States had not consented to be sued.

A lengthy dissent would not change my brethren's views. The dissent, therefore, will be in summary form.

1. The majority, relying largely on legal writings, other than decided cases, writes as to what the law ought to be, and thereon bases its reversal. It is not the function of our courts to legislate. This is the business of Congress.

2. The opinion flies in the face of the Supreme Court's decisions in Larson v. Domestic and Foreign Commerce Corp., (1949) 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1928; Malone v. Bowdoin (1962), 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d

168; Dugan v. Rank (1963), 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 115; and City of Fresno v. California (1963), 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28. Three of the cases, *Larson, Dugan* and *City of Fresno* directly concerned property owned by the United States. Here the water from the Columbia Basin project is owned by the United States and the action seeks to direct how the United States disposes of its water. The cited cases control.

The opinion is contrary to White v. Administrator of General Services Admin. (9 Cir. 1965), 343 F.2d 444 which is directly in point. The action was to compel the execution of a deed conveying an interest in land.

3. *Larson,* supra, provides two exceptions to the application of the doctrine of sovereign immunity; (1) when the officer's powers are limited by statute and his actions are ultra vires; and (2) when the officer is acting unconstitutionally or pursuant to an unconstitutional statute.

Here, there were no contentions as to the second exception.

4. In our case there can be no contention that the federal officials were acting *ultra vires.* They were doing exactly what the statute, 43 U.S.C. 423e, required of them.

5. Where a federal officer has authority, action taken by him which is erroneous, because of a mistake of law or fact, does not become action *ultra vires* or beyond his delegated authority. *Dugan,* supra, p. 622, 83 S.Ct. 999; *Larson,* supra, pp. 695, 701–702, 69 S.Ct. 1457; Adams v. Nagle (1938), 303 U.S. 532, 542, 58 S.Ct. 687, 82 L.Ed. 999.

The opinion states "The resolution of this issue [whether the Secretary's imposition of the 160 acre limitation was within his delegated powers] depends on whether Congress granted to the Secretary * * * the discretionary authority to make incorrect as well as correct decisions concerning the necessity for the inclusion of the 160-acre limita-

tions in the contracts.⁹" The authorities

9. *See* Byse, *supra* note 7, at 1490–91; Jaffe, The Right to Judicial Review I, 71 Harv.L.Rev. 401, 437 (1958); cf. Adams v. Nagle, 303 U.S. 532, 542, 58 S.Ct. 687, 82 L.Ed. 999 (1938). Professor Byse has observed,

> "The vice of *Larson* and its progeny is that they permit—perhaps even encourage—courts to shirk the hard task of determining the limits of official power. It is perfectly possible for a court to hold that an official has authority to make erroneous as well as correct determinations. Such a holding, of course, should rest on a reasoned determination that Congress intended to confer so broad a discretion. But under *Larson* * * * *et al.,* the courts seem to interpret the statutes cursorily to authorize the defendant official to act in the 'general' area in question; so long as the official remains within the 'general' area, his erroneous acts are unreviewable whether or not the statute properly construed was intended to confer such an unreviewable discretion. This, I submit, is an abdication of judicial responsibility." 75 Harv.L.Rev. at 1490–91 (citations omitted).

cited for this statement in note 9 are the legal and text book writers.

The statement gave the Secretary the express power to do exactly what he did. His interpretation that school lands were "land held in private ownership" was at the very best erroneous. Neither the majority opinion or this dissent should reach the question of the proper interpretation to be given that language, since it was not considered below. A reasonable interpretation may well be that all lands, not the property of the United States, or public lands, are private lands.

The majority opinion is contrary to the controlling authorities cited above.

6. Since we think that the United States has not consented to be sued and the trial court properly applied the doctrine of sovereign immunity there is no need to discuss the jurisdiction of the trial court. The majority, we think, correctly notes that neither the mandamus statute or the Administrative Procedure Act, represents a consent by the United States to be sued or a waiver of sovereign immunity.

Although we agree, the authorities are in a state of confusion and the problem merits, in a proper case, more than the passing reference in the note referred to above.[1]

The judgment should be affirmed.

---

1. For cases holding or intimating that the Administrative Procedure Act does not constitute a consent to sue the United States and/or does not confer jurisdiction over the United States or government officials,—See White v. Administrator of General Services Admin. (9 Cir. 1965), 343 F.2d 444; Chournos v. United States (10 Cir. 1964), 335 F.2d 918, 919; Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe (8 Cir. 1967), 370 F.2d 529; Cyrus v. United States (1 Cir. 1955), 226 F.2d 416, 417; Aktiebolaget Bofors v. United States (1951), 90 U.S. App.D.C. 92, 194 F.2d 145, 149; Motah v. United States (10 Cir. 1968), 402 F. 2d 1. And see Dugan v. Rank, supra, and City of Fresno v. California, supra, where the Administrative Procedure Act is not mentioned.

For cases holding or intimating that the Administrative Procedure Act is a consent to sue the United States, see Coleman v. United States, (9 Cir. 1966) 363 F.2d 190; reversed in United States v. Coleman, 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170; Adams v. Witmer (9 Cir. 1958), 271 F.2d 29; Mulry v. Driver (9 Cir. 1966), 366 F.2d 544; Estrada v. Ahrens (5 Cir. 1961), 296 F.2d 690; Brennan v. Udall (10 Cir. 1967), 379 F. 2d 803, cert. denied 389 U.S. 975, 88 S. Ct. 477, 19 L.Ed.2d 468; Abbott Laboratories v. Gardner (1967), 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681; Converse v. Udall (9 Cir. 1968), 399 F.2d 616, cert. denied (1969) 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569 relying on Coleman v. United States, in the circuit (363 F.2d 190).